**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
Urbana Division**

| | |
|---|---|
| WILLIE HALL, )<br>                **Plaintiff,**  )<br>v.                         )<br>                            )<br>MICHAEL J. ASTRUE,  )<br>COMMISSIONER OF SOCIAL  )<br>SECURITY,                )<br>                  **Defendant.**  ) | Case No. 06-2225 |

# REPORT AND RECOMMENDATION

In January 2006, Administrative Law Judge (hereinafter "ALJ") John Wood denied disability insurance benefits and supplemental security income benefits to Plaintiff Willie Hall. The ALJ based his decision on findings that Plaintiff was not disabled within the meaning of the Social Security Act and he was capable of performing a significant number of jobs available in the national economy.

In December 2006, Plaintiff filed a Complaint (#5) against Defendant Michael Astrue, the Commissioner of Social Security, seeking judicial review of the final decision by the Regional Commissioner of the Social Security Administration denying disability insurance benefits. In May 2007, Plaintiff filed a Motion for Summary Judgment (#12) and in August 2007, Defendant filed a Motion for an Order Which Affirms the Commissioner's Decision (#16). After reviewing the administrative record and the parties' memoranda, this Court recommends, pursuant to its authority under 28 U.S.C. § 636(b)(1)(B), that Plaintiff's Motion for Summary Judgment **(#12)** be **GRANTED**.

### I. Background
#### A. Procedural Background

Plaintiff applied for benefits in May 2003, alleging disability beginning October 1, 2002, due to depression and dermatitis. The Social Security Administration denied his application

initially and upon reconsideration. He appealed and ALJ Wood held a hearing in November 2005. An attorney represented Plaintiff at the hearing. In January 2006, ALJ Wood denied Plaintiff's application for benefits based on findings that Plaintiff was not disabled within the meaning of the Social Security Act and he was capable of performing a significant number of jobs that exist in the national economy. In September 2006, the Appeals Council denied Plaintiff's request for review and Plaintiff subsequently appealed the decision to this Court.

### B.  Plaintiff's Medical Background

Plaintiff was forty-four years old in November 2005 at the time of the hearing. He has completed thirteen years of education. He has worked as a machine operator, machine feeder, cashier, and salesperson. The following background is taken from the record, which covers the period from 1999 to 2005.

Plaintiff reports that he has had dermatitis for many years. For this case, his medical records begin in December 1999. In December 1999, Plaintiff had blisters on parts of his body and was having difficulty sleeping some nights. (R. 348.) In June 2000, Plaintiff was assessed with atopic dermatitis and the record notes that Plaintiff is "very miserable." (R. 344.) In May 2001, Plaintiff stated he was doing very well. (R. 330.) In June 2001, Plaintiff was "under a restriction to work no more." (R. 327.) In January 2002, medical records note that Plaintiff's dermatitis had improved. (R. 318.)

In September 2002, Dr. Mark Farber, a pulmonary specialist, examined Plaintiff for evaluation of his dermatitis, allergies, and shortness of breath. (R. 229-30.) He noted that Plaintiff had worked around various grain dusts for eleven years and the past year he has experienced itching which keeps him up at night and causes excoriations of his skin. At that time, Dr. Farber noted that Plaintiff had no known allergies. Dr. Farber referred Plaintiff to Dr. Stephen Wolverton for evaluation of dermatitis and to Dr. Duane Houser for evaluation of allergy. In October and December 2002, Dr. Farber examined Plaintiff for pulmonary and cardiovascular abnormalities. (R. 226-28.) In January 2003, Dr. Farber examined Plaintiff and

noted that "it is very probable that any and all organic dust or inorganic dust to which he is exposed have caused and will continue to cause a problem, therefore I have precluded him from working is [(*sic*)] his present work environments." (R. 224.) He also observed that Plaintiff's lesions showed some lichenification and some areas were painful to palpitation, but there were no obvious excoriated areas. In October 2003, Dr. Farber noted that grain dust apparently caused the dermatitis and stated that Plaintiff was precluded from working around grain dust because of his allergy to it. (R. 370.)

In July 2003, Dr. S. Raju, D.O., examined Plaintiff. (R. 211-14.) He noted that Plaintiff had atopic dermatitis that causes itching, severe allergy to grain dust, depression, diabetes mellitus, and occasional low back pain. He noted that Plaintiff is allergic to oats, pollen, and nuts. Plaintiff's dermatitis had improved since he stopped working at Quaker Oats Company, but he had a rash all over his body, especially on his ankles, hands, knees, buttocks, and back, and he has difficulty sleeping because of the itching. Dr. Raju found no limitations in sitting, standing, walking, carrying, handling objects, hearing, speaking, or traveling, and no restrictions in fine and gross manipulation using either hand. Plaintiff also attended counseling during October and November 2003. (R. 243-45.)

In August 2003, Dr. James Mason, a clinical psychologist, wrote a psychological report. (R. 219-22.) He noted that Plaintiff produced a list of his medications, including neurontin, doxepin, allegro, flonase, prednisone, nicomide, klonopin, luvox, cepherin, and remeron. Plaintiff told the doctor that the quantity of medication he uses leads to extreme fatigue and depression. Dr. Mason summarized his report stating that Plaintiff met the criteria for major depressive episode.

In August 2003, Dr. Phyllis Brister performed a psychiatric review of Plaintiff and found that Plaintiff exhibited mild limitations on his daily living activities and ability to maintain social functioning, moderate limitation in the area of maintaining concentration, persistence, or pace, and no episodes of decompensation. She concluded that the evidence did not establish the

presence of "C" criteria. (R. 256-69.) In September 2003, Dr. Brister completed a mental residual functional capacity (hereinafter "RFC") assessment, concluding that Plaintiff was moderately limited in his ability to carry out detailed instructions, to maintain attention and concentration for extended periods, and to understand and remember detailed instructions. (R. 266-73.) In December 2003, Dr. Terry Travis completed a physical RFC assessment and concluded that Plaintiff had the ability to lift twenty pounds occasionally and ten pounds frequently, to stand and/or walk about six hours in an eight-hour workday, and to sit for about six hours in an eight-hour day. He had no limitations on his ability to push and/or pull, no restrictions in fine and gross manipulation in both hands, no manipulative limitations, no visual limitations, no communicative limitations, and no postural limitations except that he was excluded from climbing ropes or scaffolds due to a history of back pain. He had no environmental limitations except that he is excluded from working where he would experience concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc., due to allergic rhinitis. (R. 267-81.)

In September 2003, Dr. Lynette Caillouet noted that she has been seeing Plaintiff intermittently since August 2002 to treat his skin condition. (R. 251, 248-50, 252-55.)

In September, October, November 2003, and January, February, March, and April 2004, Dr. Surinderpal Kahlon, a psychiatrist, met with Plaintiff. (R. 236-42, 350-57.) He diagnosed Plaintiff with major depressive disorder and general anxiety disorder.

Dr. Stephen Wolverton, a dermatologist, began treating Plaintiff in September 2002. (R. 311.) He met with Plaintiff many times and treated Plaintiff with prescription medications. (R. 366-69 (April and May 2004), R. 361-62 (January and April 2005).) In July 2004, he stated that Plaintiff should avoid factories and extreme hot and cold. (R. 312.) In August 2004, he noted that Plaintiff's hands were much improved. (R. 364.) In September 2005, Dr. Wolverton noted that Plaintiff's condition had been exacerbated by some personal problems and Plaintiff was experiencing a significant flare up. He continued to prescribe medication. (R. 359.)

In November 2003, Dr. Debra Fett, a dermatologist, stated that she "suspect[s] that the work related products such as oats, rice, sugar, etc. are causing exacerbation of his atopic disease." (R. 285.) However, her notes do not mention test results. (R. 284-85.) In July 2003, Dr. Raju noted that Plaintiff is allergic to oats, pollen, and nuts. (R. 212.)

In December 2003 and February 2004, Angela Kenney, a physician's assistant for Dr. Wolverton and Dr. Charles Lewis, saw Plaintiff for a follow-up on his dermatitis. (R. 282-83.) She stated that Plaintiff reported that Dr. Fett had performed patch testing "which was negative for any cutaneous reactions. He did have R.A.S.T. test ordered by his allergist and those tests were positive for multiple food allergies." (R. 283.)

In December 2005, Dr. Wolverton completed a physical RFC questionnaire. (R. 378-82.) He opined that Plaintiff's atopic dermatitis was in the 90th percentile and could be expected to persist indefinitely. The primary symptom is itching; in addition, the dermatitis has a significant depression component and emotional factors contribute to the severity of his condition. He stated that Plaintiff has experienced significant sedation with doxepin, which is prescribed for itching. Plaintiff's symptoms frequently interfere with his attention and concentration, however, he can tolerate a low stress job. The condition does not limit Plaintiff's ability to walk, sit, stand, lift and carry, move his head, twist, stoop, crouch, climb ladders or stairs, reach, handle, or perform fine manipulations. Dr. Wolverton noted that Plaintiff had good and bad days but was uncertain how many days per month he would likely be absent from work as a result. Finally, Dr. Wolverton stated that Plaintiff has had severe pruritus (itching) with secondary infections, has difficulty concentrating, and suffers from depression.

### C. Testimony at the Hearing

At the hearing, Plaintiff testified that he worked at Quaker Oats as a process forming operator for about thirteen years and stopped working there in August 2002. His job involved lifting fifteen to twenty pounds frequently and 100 pounds occasionally. Before working at Quaker Oats, he worked as an operator at a Chuckles Candy factory. He continues to act as a

5

minister, preaching on Sunday and visiting people in hospitals about four to six hours a week. His work as a minister is not a paid position, although he receives donations. He drove to the hearing and he has no limitations related to driving.

Plaintiff testified that he is allergic to "cardboard, paper, anything that I handle on a pretty much often basis. I deal with the cracking of my skin, and bleeding in my fingers and hands." (R. 433.) He experiences pain and discomfort off and on. He experiences fatigue regularly, partly because the itching keeps him awake at night. If he takes too much medicine for the itching, then he has trouble getting up in the morning and functioning. He testified that the rash covers ninety-eight percent of his body and the itching makes him miserable. Plaintiff's medication helps his depression. Regarding his mental functioning, he noticed that he has become more forgetful in the last few years.

Plaintiff lives by himself. On a typical day, he will get up around 8:00 to 8:30. He takes care of his own personal hygiene. He will pray and read the Bible for about an hour to an hour and a half. He might then drive to his father's house to check on his father. If he has nothing else going on, he might go to the church and see if anyone needs anything. He seldom cooks. He does his own laundry and dishes, vacuums, grocery shops, takes the garbage out, and handles his finances. Plaintiff does not participate in outdoor activities other than mowing his yard with a push mower. He used to bowl and play basketball but does not do those activities now because his rash becomes irritated when he starts perspiring. He does not belong to any clubs or organizations. At home, he will watch TV and listen to music.

Dr. James Lanier, the vocational expert (hereinafter "VE"), also testified at the hearing. He stated that he had reviewed the exhibits in the file dealing with Plaintiff's past work and he heard Plaintiff's testimony at the hearing. The ALJ questioned the VE regarding a hypothetical individual with Plaintiff's past work who was able to perform the full range of light work with only occasional climbing of ladders, ropes, and scaffolds and who must avoid concentrated exposure to all environmental factors except for noise and vibration. The VE stated that such an

individual would be unable to perform past work as a machine feeder or machine operator, but he would be able to perform the job of auto parts salesperson, a job classified as semi-skilled, light work, or the job of pastor, a job classified as light work. (R. 452.)

When the ALJ limited the individual to preclude even moderate exposure to environmental factors, the VE testified that the individual would be able to perform the auto parts sales job and the pastor job. The ALJ then added a limitation to simple repetitive tasks. The VE testified that a limitation to simple repetitive work would eliminate the auto parts sales job and the pastor job.

The ALJ then repeated his first hypothetical question, about an individual who can perform light work with only occasional climbing of ladders, ropes, and scaffolds, and who must avoid concentrated exposure to all environmental factors except for noise and vibration. He then added to this hypothetical individual the vocational factors of claimant's age, education, and work history. The VE testified that such a person could perform a number of unskilled jobs that exist in the national economy, including 7,753 jobs in retail; cashier II, light, 39,008 jobs; interviewer, sedentary, 1,378 jobs; interviewer, light, 3,972 jobs; admission clerk, sedentary, 4,436 jobs; admission clerk, light, 3,972 jobs; general office clerk, sedentary, 3,778 jobs; and general office clerk, light, 7,139 jobs. (R. 456.)

The ALJ then asked the same hypothetical question with the further limitation of avoiding even moderate exposure to the environmental factors. The VE testified that such a limitation would not affect the occupational base. A limitation to simple repetitive tasks would also not affect the occupational base because all the jobs listed had an SVP (specific vocational preparation) of 1 or 2. However, if the individual had to avoid all exposure to the identified environmental factors, then all jobs would be eliminated.

In response to the ALJ's questioning, the VE testified that his testimony was consistent with the Dictionary of Occupational Titles (hereinafter "DOT"). (R. 457.)

In response to questioning by Plaintiff's counsel, the VE testified that a hypothetical individual doing the jobs listed above would be able to take a break every two hours in an eight-hour work-day and no more than two absences per month would be tolerated.

### D. The ALJ's Decision

To be entitled to social security disability benefits, a plaintiff must show that he is unable to engage in any substantial gainful activity because of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of at least twelve months. 42 U.S.C. § 416(i)(1). To determine disability, the Commissioner uses a five-step sequential evaluation. He determines: (1) whether the claimant is presently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment, that is, one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his past relevant work; and (5) if the claimant cannot perform the past work, whether the claimant can do other jobs that are available in the national economy. The claimant bears the burden of production and persuasion at steps one through four. Once the claimant shows he is unable to perform past work, the burden shifts to the Commissioner to show that the claimant is able to engage in some other type of substantial gainful employment. *Campbell v. Shalala*, 988 F.2d 741, 743 (7th Cir. 1993).

The ALJ's decision followed this five-step process. At the first step, the ALJ found that Plaintiff has not been engaged in substantial gainful activity since the onset of disability. At the second step, the ALJ determined that the record showed that Plaintiff had severe impairments including dermatitis and depression. At the third step, the ALJ determined that Plaintiff's condition did not meet or medically equal any of the impairments listed in the regulations. At step four, the ALJ determined that Plaintiff was not able to perform his past relevant work. The ALJ determined that Plaintiff had the RFC to perform light work activities with occasional climbing of ladders, ropes, or scaffolds, performing simple and repetitive tasks, and avoiding

even moderate exposure to extremes of cold or heat, wetness, humidity, fumes, odors, gasses, dust, poor ventilation, or hazards.  Based on this RFC, at step five, the ALJ determined that Plaintiff was able to perform a significant number of jobs available in the national economy despite his impairments.  Finally, the ALJ stated that Plaintiff's alleged limitations were not fully credible.  As a result, the ALJ found that Plaintiff was not eligible for social security benefits. (R. 25.)

## II. Standard of Review

In reviewing an ALJ's decision, this Court does not try the case *de novo* or replace the ALJ's finding with the Court's own assessment of the evidence.  *Pugh v. Bowen*, 870 F.2d 1271, 1274 (7th Cir. 1989).  The findings of the Commissioner of Social Security as to any fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Thus, the question before the Court is not whether a plaintiff is, in fact, disabled, but whether the evidence substantially supports the ALJ's findings.  *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).  The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether a plaintiff is disabled, the Court must affirm the ALJ's decision denying benefits.  *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996).

The Court gives considerable deference to the ALJ's credibility findings and will not overturn them unless the plaintiff can show that those findings are patently wrong.  *Urban v. Sullivan*, 799 F. Supp. 908, 911 (C.D. Ill. 1992).  However, when credibility determinations rest on objective factors or fundamental implausibilities rather than subjective considerations, reviewing courts have more freedom to review the ALJ's credibility determination.  *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).

### III.  Analysis

Plaintiff argues that the ALJ erred for the following reasons:  (1) the ALJ violated SSR 00-4p's directives relating to the DOT; (2) Plaintiff cannot work as a cashier because of the skin disease on his hands; (3) the ALJ erroneously evaluated the side effects of Plaintiff's medications; and (4) the ALJ based his decision regarding Listing 8.05 on speculation.

#### A.  The VE's Testimony

Plaintiff first argues that the ALJ violated SSR 00-4p's directives relating to the DOT by relying on the VE's statements identifying jobs that the claimant could do because the VE's testimony was incorrect.  According to Plaintiff, the VE departed from the DOT without explaining why and the VE misidentified several jobs.  Specifically, Plaintiff contends that the VE identified the admission clerk job, the interviewer job, and the general office clerk job as unskilled sedentary jobs, while the DOT does not list any of these as sedentary; the VE identified the admission clerk job as unskilled light work, while DOT 205.362-018 (hospital-admitting clerk) lists it as semi-skilled (SVP 4) light work; and the VE identified the general office clerk job as unskilled light work, while DOT 219.362-010 (administrative clerk) lists it as semi-skilled (SVP 4) light work.  Plaintiff contends that incorrect VE testimony does not constitute "substantial evidence," thus, the ALJ reliance on the VE's incorrect testimony constitutes grounds for remand.  In support, Plaintiff cites *Allord v. Barnhart*, 455 F.3d 818, 821-22 (7th Cir. 2006) (discussing harmless error), in which the court remanded the case because the ALJ's credibility finding was based on errors of fact or logic.

Defendant responds that it does not matter whether the ALJ describes a job as sedentary when the DOT lists it as light work because the ALJ found that Plaintiff could do both light and sedentary work.  *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (stating that someone who can do light work can do sedentary work, unless there are additional limiting factors, such as loss of fine dexterity or inability to sit for long periods.)  Defendant concedes that the requirements of general office clerk and admission clerk exceed the requirements of unskilled work but states that "even when those jobs are eliminated, there remains a significant number of jobs that

Plaintiff can perform." (#17, p. 15.)  *See Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003) (applying harmless error review to ALJ's determination).  Defendant notes that Plaintiff has not objected to the skill or exertional levels of the cashier job, which, according to the DOT, is unskilled light work.  *See* DOT, No. 211.462-010 (Cashier II description).

SSR 00-4p provides that an ALJ who takes testimony from a VE about the requirements of a particular job has an affirmative duty to determine whether that testimony is consistent with the DOT.  *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006).  Here, the ALJ satisfied this duty by questioning the VE who responded that his testimony was consistent with the DOT. (R. 457.)  The ALJ then asked Plaintiff's counsel if he had any questions, and the only issue that counsel raised was whether the claimant's constant itching of his hands would affect his ability to perform the jobs the VE testified about and how many breaks and absences the hypothetical individual would be able to take and retain his job. (R. 457-58.)

Plaintiff acknowledges that the ALJ fulfilled his affirmative responsibility under SSR 00-4p to ask the VE whether his testimony was consistent with the DOT.  Nevertheless, Plaintiff contends that the Court must remand the case because the VE's testimony was, in fact, incorrect.

A plaintiff raised the same argument in *Lembke v. Barnhart*, No. 06-C-0306-C, 2006 WL 3834104, *14-15 (W.D. Wis. Dec. 29, 2006).  The district court rejected the argument, clearly stating its reasoning as follows:

> Although plaintiff appears to suggest that the ALJ did not comply with this ruling, the ALJ asked the VE if his testimony was consistent with the information contained in the DOT and the VE responded that it was.  Plaintiff also concedes that her attorney did not cross-examine the VE on this issue or ask him to explain the job requirements in more detail.  Plaintiff appears to argue that reversal is warranted any time a plaintiff identifies a potential conflict with the DOT, even if the ALJ complies with his duty under SSR 00-4p and even if plaintiff does not identify a conflict until after the hearing.

**11**

>       This argument cannot prevail. According to the VE's resumé, he had personal knowledge of the information contained in the DOT as well as of the numbers of light and sedentary jobs in the economy. AR 63. The ALJ complied with his duty and asked the VE whether his testimony concerning the types of jobs that a hypothetical person of plaintiff's age, education and residual functional capacity could perform was consistent with the DOT. Hearing the VE's affirmative response, the ALJ had no obligation under SSR 00-4p to inquire further. He was entitled to conclude from the VE's qualifications and his testimony that the VE's testimony was reliable. *See Donahue v. Barnhart,* 279 F.3d 441, 446 (7th Cir. 2002) ("an expert is fee to give a bottom line, provided that the underlying data and reasoning are available on demand").
>
>       Although the ALJ was required under SSR 00-4p to explore whether there was a conflict, plaintiff cites no authority to support her contention that he was required to go further and challenge the VE's testimony that there was not. If plaintiff was not satisfied with the VE's assertion that his testimony did not conflict with the DOT, then she should have cross-examined him. Because the ALJ complied with his duty under SSR 00-4p and the record before the ALJ did not reveal any shortcomings in the VE's data, the ALJ was entitled to rely on the VE's testimony in reaching his conclusion at step five. This goes for the VE's testimony regarding the types of jobs plaintiff could perform as well as his testimony concerning the numbers of those jobs existing in the economy. Moreover, plaintiff has not produced any vocational evidence to support her suggestion that the numbers of jobs identified by the VE do not exist.

*Lembke*, 2006 WL 3834104, at *14-15.

       The Court agrees with the reasoning stated in *Lembke*. Here, as in *Lembke*, the VE stated that his testimony was consistent with the DOT. Plaintiff's counsel had an opportunity at the hearing to cross-examine the expert regarding the classification of the jobs the VE cited, but did not do so. Thus, no discrepancy or inconsistency was identified during the hearing. Seventh Circuit case law is clear that any inconsistency between the VE's testimony and the DOT must be identified at the hearing. *See Jurcevic v. Astrue*, 515 F. Supp. 2d 869, 879 (N.D. Ill. 2007) ("The Seventh Circuit has made clear, however, that with respect to the DOT, the ALJ is not required to resolve discrepancies between the VE's testimony and the DOT unless the discrepancy was made known at the hearing.") (citing *Donahue,* 279 F.3d at 446-47). If no discrepancy or inconsistency is identified, then the ALJ may safely rely on the VE's testimony.

In his reply, Plaintiff raised one additional argument:  Even assuming that a plaintiff bears the burden of proving that the VE was mistaken, here, Plaintiff met this burden by rebutting the VE's testimony before the Appeals Council.  *See* R. 407-17.  In support of this argument, Plaintiff relied on *Peterson v. Chater*, 96 F.3d 1015, 1016 (7th Cir. 1996).  The *Peterson* case does not support Plaintiff's argument.  In that case, there was no claim that any hearing testimony conflicted with the DOT and, in fact, no VE had even been consulted.

Thus, even if the VE's testimony was inconsistent with the DOT, that does not institute a basis for remand under the circumstances present in this case.

### B.  Side Effects of Plaintiff's Medications

Plaintiff next argues that the ALJ's statement that "[n]o significant side-effects are reported" (R. 23) is factually incorrect and shows that the ALJ failed to adequately evaluate the side effects of Plaintiff's medications.  Specifically, Plaintiff referred to Dr. Wolverton's statement that Plaintiff had "significant sedation with Doxepin used for itching."  (R. 378.)  In addition, Plaintiff contends that the ALJ did not adequately explain why he rejected Dr. Wolverton's "confirmation of significant medication side effects."  (#13, p. 10.)

Dr. Wolverton's December 2005 report, a general report on Plaintiff's physical RFC, stated only that Plaintiff "has had significant sedation with doxepin used for itching."  (R. 378.)  In the clinic notes addressing this issue, Dr. Wolverton indicated that Plaintiff was taking the doxepin at night and that, although it had a significant sedative effect, "by the time he wakes up he finds minimal to no hangover effect."  (R. 299.)  In light of Dr. Wolverton's clinic notes, the Court concludes that the ALJ did not err by concluding that Plaintiff experienced no significant side effects.  This is the only issue that Plaintiff raised regarding side effects of his medication.

### C. Whether the ALJ's Conclusion Regarding Listing 8.05 Was Based on Speculation

Plaintiff next argues that the ALJ's decision regarding Listing 8.05 was improperly based on speculation. As Plaintiff points out, Listing 8.05–Dermatitis requires "extensive skin lesions that persist for at least 3 months despite continuing treatment as prescribed." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A, § 8.05. Plaintiff contends that the ALJ erred by stating that Plaintiff's skin lesions would not persist. *See* R. 22. Plaintiff also contends that the ALJ erred by failing to obtain medical expert testimony to clarify the issue of persistence of the lesions.

Defendant responds that the ALJ did not base his conclusion regarding the Listing on the fact that the lesions would not persist, but that the dermatitis had responded to treatment. *See* R. 282 (in February 2004, Plaintiff "states that his ankles have flared recently because of stress but the rest of his skin is doing well"); R. 364 (in August 2004, Plaintiff "thinks that he is having a little bit of a flare on his leg but his hands are much improved"). In addition, Defendant contends that Plaintiff failed to prove his condition satisfied Listing 8.05 because no doctor ever reported that Plaintiff's dermatitis very seriously limited his ability to walk, move his joints, or perform gross and fine manipulation with his hands. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A, § 8.00(C)(1) (giving examples of "extensive skin lesions" that result in "a very serious limitation").

Plaintiff is correct that Defendant may not rely on post-hoc arguments to justify the ALJ's decision. "[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ." *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003). Therefore, Defendant cannot rely on the argument that Plaintiff failed to prove his dermatitis condition involved "extensive skin lesions."

On the other hand, Defendant is correct that the ALJ did not rely on lack of persistence when he determined that Plaintiff's condition failed to satisfy Listing 8.05. The Court has reviewed the ALJ's decision as it relates to the Listing. The ALJ stated that Plaintiff's

"dermatitis does not satisfy section 8.05, because the condition has responded to treatment." (R. 22.)  Thus, Plaintiff's argument regarding persistence is unavailing.

### D.  The Cashier II Position

Plaintiff next argues that he cannot work as a cashier because his dermatitis affects his hands and wrists.  He states that a cashier cannot handle food or new merchandise if his hands and/or wrists are inflamed.  Plaintiff also states that he is allergic to many food and paper products and that would preclude his employment at a store that sold food or merchandise packed in paper products.

In support of these arguments, Plaintiff testified at the hearing that he is allergic to "cardboard, paper, anything that I handle on a pretty much often basis.  I deal with the cracking of my skin, and bleeding in my fingers and hands."  (R. 433.)  He stated as follows:

> [T]he dermatitis affects my ability to use my hands] [b]ecause basically anything I come in contact with, paper, cardboard, anything that can dry my hands out or even really like, even if I was even to do dishes, like sometimes when I do dishes, my hands break out they crack.  As to what I have right now, what you call the peeling of my skin, even right now, to this day.  But pretty much everything that I deal with just breaks me out.

(R. 445-56.)  In his brief, Plaintiff referred to the following evidence regarding his hands:  In June 2003, a medical record indicated extensive lichenification on wrists and ankles and Plaintiff's prescriptions were refilled.  (R. 371.)  In July 2003, Dr. Raju reported that Plaintiff is severely allergic to grain dust and had dermatitis all over his hands.  Dr. Raju expressly stated that he did not find any restrictions in work-related activities including carrying or handling objects.  (R. 214.)  In October 2003, Dr. Wolverton reported that Plaintiff's dermatitis had flared up and he complained of extreme itching and cracks in his hands and left ankle.  Plaintiff's left wrist exhibited a lichenified plaque.  (R. 290, 369.)  In May 2004, Plaintiff reported that his wrists and ankles were breaking out and Dr. Wolverton assessed him with dermatitis and secondary impetigo.  Dr. Wolverton prescribed medication.  (R. 366.)  In April 2005, Dr. Wolverton reported that Plaintiff exhibited extensive atopic dermatitis with lichen simplex

chronicus-like changes present on his left hand. He prescribed prednisone and ointment. The doctor noted that Plaintiff had not been using doxepin and prescribed it along with kenalog. (R. 360-61.)

The Court has reviewed the record and finds the following additional relevant evidence. In July 2003, Dr. Raju noted that Plaintiff is allergic to oats, pollen, and nuts. (R. 212.) In November 2003, Dr. Fett stated that she "suspect[s] that the work related products such as oats, rice, sugar, etc. are causing exacerbation of his atopic disease." (R. 285.) However, her notes do not mention test results. (R. 284-85.) In December 2003 and February 2004, Dr. Lewis or Angela Kenney met with Plaintiff for follow-up. The clinic notes state as follows: "Patient reports that he had patch testing by Dr. Debra Fett, which was negative for any cutaneous reactions. He did have R.A.S.T. test ordered by his allergist and those tests were positive for multiple food allergies." (R. 283.)

Plaintiff contends that a cashier cannot handle food or new merchandise if his hands are inflamed. Plaintiff also contends that his allergy to many food and paper products preclude his employment as a cashier in stores that sell food or merchandise packed in paper products. Consistent with this, Plaintiff contends that the ALJ did not reconcile the fact that Plaintiff had dermatitis affecting his hands with the finding that he could work as a cashier. It is well-settled that an ALJ must "explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) (citing *Herron*, 19 F.3d at 333-34).

As an initial matter, the Court agrees with Defendant that the DOT description for Cashier II, the job the VE testified about, does not indicate food handling is a requirement for the job. The Cashier II description states only that person "may sell candy, cigarettes, gum." DOT 211.462-010. As Defendant notes, this does not preclude food handling; the description encompasses a variety of cashier jobs and is not limited to those that sell food. Regarding Plaintiff's statement that he is allergic to paper products, Plaintiff did not cite any medical

evidence supporting such an allergy. Thus, based on the DOT description for Cashier II, the Court cannot conclude that Plaintiff's food allergies preclude him from performing that job.

Notwithstanding this conclusion, Plaintiff's argument also raises the issue that the ALJ failed to include all of Plaintiff's limitations in the hypothetical questions to the VE. The ALJ's hypothetical questions must incorporate all limitations supported by the medical evidence in the record in order for the VE's testimony to constitute substantial evidence. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Here, the RFC that forms the basis for the hypothetical questions to the VE states that Plaintiff can "perform work-related activities except for work involving a limitation to light work, with occasional climbing of ladders or ropes or scaffolds, performing simple and repetitive tasks, and avoiding even moderate exposure to extremes of cold or heat, wetness, humidity, fumes, odors, gasses, dust, poor ventilation or hazards." (R. 25.) Thus, the RFC did not include any reference to Plaintiff's particular allergies.

During his discussion of Plaintiff's RFC, the ALJ acknowledged that Dr. Wolverton, Plaintiff's treating physician, and Dr. Farber both opined that Plaintiff should "avoid topical or airborne irritants." (R. 22.) Specifically, the ALJ stated as follows:

> Dr. Wolverton wrote in February 2003 that the claimant should seek alternate employment, away from factory settings (Exhibit 11F/13). In July 2004, Dr. Wolverton repeated that the claimant should avoid topical or airborne irritants (Exhibit 14F). In December 2003, Dr. Farber stated that the claimant had problems with exposure to dusts in his work environment, which had resolved with removal from the exposure (Exhibit 13F). Therefore, he could work as long as the work environment minimizes his exposure to pulmonary irritants.

(R. 22.) As noted above, the RFC does state that Plaintiff should avoid even moderate exposure to environmental factors of extreme cold or heat, wetness, humidity, fumes, odors, gasses, dust, and poor ventilation. However, it does not include any mention of those "topical and airborne irritants" supported by the record that Plaintiff is to avoid. If the ALJ failed to include limits on the "topical and airborne irritants" that Plaintiff is supposed to avoid because the ALJ rejected the opinions of these doctors, which appear to be uncontradicted, the ALJ has failed to explain

17

his reasoning. 20 C.F.R. § 404.1527(d)(2); *Herron*, 19 F.3d at 333 (noting that the ALJ cannot, without adequate explanation, discount an uncontradicted, dispositive medical opinion).

For a VE's testimony to be reliable, the hypothetical questions posed to the VE must include all limitations supported by medical evidence in the record. *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004); *Herron,* 19 F.3d at 337; *Steele,* 290 F.3d at 942 (the hypothetical question that an ALJ poses to a VE "ordinarily must include *all* limitations supported by medical evidence in the record."). This is especially true where the ALJ expressly circumscribes the exact limitations the VE is to consider, as he did in this case by stating to the VE, "I'm going to give you some hypothetical questions. Please disregard any information you may have gathered in the file, or listening to the testimony, other than that which I give you specifically in the hypothetical." (R. 449.) *See Young*, 362 F.3d at 1003.

"[W]here a hypothetical question is fundamentally flawed because it is limited to the facts presented in the question, and does not include all of the limitations supported by the medical evidence in the record, the ALJ's decision that Plaintiff can adjust to other work in the economy cannot stand." *Id*. at 1005. Here, because the RFC fails to account for the limitations imposed by Plaintiff's allergies, the hypothetical questions to the VE were inadequate, calling into question the reliability fo the VE's testimony. Accordingly, the Court recommends granting Plaintiff's motion for summary judgment and remanding this case for further consideration consistent with this report and recommendation.

### IV.  Summary

For the reasons set forth above, the Court recommends **GRANTING** Plaintiff's Motion for Summary Judgment **(#12)** and remanding the case pursuant to sentence four of 42 U.S.C. § 405(g)[1] for further consideration consistent with this report and recommendation.

The parties are advised that any objection to this recommendation must be filed in writing with the Clerk within ten (10) working days after service of a copy of this recommendation.  *See* 28 U.S.C. 636(b)(1).  Failure to object will constitute a waiver of objections on appeal.  *Video Views, Inc. v. Studio 21, Ltd.,* 797 F.2d 538, 539 (7th Cir. 1986).

ENTER this 21st day of February, 2008.

                                             s/ DAVID G. BERNTHAL
                                             U.S. MAGISTRATE JUDGE

---

[1] Under 42 U.S.C. § 405(g), sentence four, "[t]he court shall have power to enter, upon pleadings and transcripts of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a hearing."